UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRANDON BLUHM,

                Plaintiff,

     v.

WYNDHAM DESTINATIONS INC., et al.,

                Defendants.

CASE NO. C18-5813 BHS

ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND GRANTING DEFENDANTS' MOTION TO TRANSFER VENUE

     This matter comes before the Court on Defendants Wyndham Destinations, Inc. ("WDI") (formerly Wyndham Worldwide Corporation ("WWC")), Wyndham Vacation Ownership, Inc. ("WVO"), and Wyndham Vacation Resorts, Inc.'s ("WVR") (collectively, "Defendants") motion to dismiss second amended complaint and/or for summary judgment and/or to transfer venue. Dkt. 37. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion to transfer venue and denies the remainder of the motion for the reasons stated herein.

# I. PROCEDURAL HISTORY

Plaintiff Brandon Bluhm ("Bluhm") filed suit in this Court on October 8, 2018. Dkt. 1. On January 24, 2019, Defendants moved for transfer of venue, or in the alternative for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), 12(b)(7), or summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. 11. On April 9, 2019, the Court granted Defendants' motion to dismiss without prejudice on the basis of Bluhm's failure to establish jurisdiction and granted Bluhm leave to amend his complaint. Dkt. 18.

On April 19, 2019, Bluhm filed his First Amended Complaint. Dkt. 19. On May 3, 2019, Defendants filed a second motion to dismiss, or in the alternative for summary judgment, or in the alternative to transfer venue. Dkt. 20. On May 13, 2019, the Court entered the parties' stipulated order to permit substitution of counsel for Bluhm. Dkt. 22. On July 12, 2019, the Court again granted Defendants' motion to dismiss for lack of jurisdiction and granted leave to amend but advised Bluhm that the Court may be skeptical of further requests for leave to amend. Dkt. 30.

On July 26, Bluhm filed his Second Amended Complaint. Dkt. 31. In addition to the named Defendants set out above, Bluhm also named Wyndham Does 1-50. *Id.* On August 9, 2019, Defendants filed a third motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(6), and/or for summary judgment, and/or to transfer venue. Dkt. 37. On September 3, 2019, Bluhm responded. Dkt. 40. On September 11, 2019, Defendants replied. Dkt. 43.

## II. FACTUAL BACKGROUND

While the Court has set out the facts of this case in previous Orders, the Court here sets out the more detailed factual allegations of the Second Amended Complaint. Dkt. 31. Bluhm generally alleges that because WDI has hundreds of subsidiaries, "it is unclear which entity (or entities) originally solicited Plaintiff's business; which entity designed, owns, and manages the reservations system at issue, which entity manages and/or employs the individuals Plaintiff spoke to about the problems that began in mid-2017, which entity (or entities) held title to Plaintiff's timeshare contracts at the time he was forced to reconvey them; or which entity makes strategic decisions concerning [Defendants'] timeshare business." *Id*. ¶¶ 14–15. In much of his complaint, Bluhm refers to Defendants collectively as Wyndham. *Id*. ¶ 7.

In 1996, Defendants mailed Bluhm an advertisement to his home in Washington State. *Id*. ¶ 24. Responding to the advertisement, Bluhm went on vacation at a resort in Pompano Beach, Florida owned by Defendants. *Id*. ¶¶ 24–25. While in Florida, Bluhm purchased a timeshare for between $27,000 and $30,000, in addition to ongoing monthly fees, from an entity called Fairfield Resorts. *Id*. ¶¶ 24 & n.10, 25. Fairfield Resorts was acquired by WVR in 2006. *Id*. ¶ 24. n.10. Bluhm continued to buy timeshare deeds and points, and by 2000, he owned 1,000,000 points, sufficient to pay for three months of travel per year. *Id*. ¶¶ 27–28. Between 2000 and 2012, Bluhm acquired additional timeshare points and deeds, more than doubling his holdings. *Id*. ¶ 29. In 2012, Bluhm learned Defendants offered a system called Extra Holidays where people who owned Defendants' timeshares could offer those timeshares for rent to the public. *Id*. ¶ 30.

Bluhm alleges that WVR managed this system, possibly along with WVO and WDI, and that Defendants' timeshares could not be listed for rent through other vacation-rental services. *Id.* ⁋⁋ 12, 30. When Bluhm sold a booking through Extra Holidays, Defendants would keep 40% of the sale, and Bluhm would receive 60%, paid by "Wyndham Vacation Ownership, Extra Holidays department." *Id.* ⁋ 31.

Bluhm continued to acquire additional timeshare interests, including indirectly from disgruntled owners, and sell bookings strategically, such that by 2013 selling bookings through Extra Holidays was his primary source of income. *Id.* ⁋⁋ 32–33. In 2016, Bluhm earned $262,000 in gross income through Extra Holidays. *Id.* ⁋ 37. In May of 2017, Bluhm owned approximately 18,000,000 points and "68 associated fractional contracts." *Id.* ⁋ 35.

Bluhm alleges that in April or May 2017, "a systemwide message informed [Bluhm] that the reservation website would be down for the weekend while [Defendants] launched a new system." *Id.* ⁋ 39. Bluhm alleges that he did not regain access to the system after the weekend and was extremely concerned because he needed to prepare for lucrative summer bookings during this period. *Id.* ⁋⁋ 41–42. Bluhm also alleges that "other customers and partners, at least those with fewer points and deeds" regained access to their accounts. *Id.* ⁋ 42. Bluhm repeatedly called and emailed Defendants but was told to "give it time." *Id.* ⁋ 43. In July 2017, Bluhm spoke to Andres Mosquera ("Mosquera") on the phone. *Id.* ⁋ 44. Mosquera "described himself as part of [Defendants'] management team and had higher level access." *Id.* Mosquera told Bluhm his access could be restored if 64 contracts were removed from his portfolio. *Id.* Bluhm

alleges that Defendants "[were] legally and contractually obligated to allow [Bluhm] to use his properties as intended" but "refused to help, stated that [they] would not honor [their] commitments, and told [Bluhm] that he had no choice but to convey the contracts back to them." *Id.* ¶ 45. Bluhm alleges that Defendants told him he could only regain access to the system if he sold back 64 contracts, the equivalent of 14,000,000 of his 18,000,000 points. *Id.* ¶ 46.

Between July 2017 and the end of August 2017, Defendants emailed Bluhm 64 "contracts and/or deeds" which he signed, notarized, and mailed back, in exchange for Defendants' paying off a $199,043.07 loan Bluhm owed to an unspecified party and Defendants' promise that he would regain access to the system. *Id.* ¶ 49. As part of these transactions Bluhm also entered the "Purported 8/17/17 Agreement" (the "August 17, 2017 Agreement") with WVO. *Id.*[1]

Bluhm alleges that he was first able to access the system on October 18, 2017 and lost five months of rental income in the intervening period. *Id.* ¶ 50. He alleges that he experiences ongoing website errors which cause him to lose income. *Id.* ¶¶ 51–52.

Finally, Bluhm alleges that in discovery, he "intends to find out whether the new system's inability to handle his accounts was a design feature maliciously implemented by Wyndham, rather than a bug as was represented." *Id.* ¶ 59.

Against all Defendants, Bluhm alleges breach of contract, violation of the Washington Timeshare Act, RCW Chapter 64.36, violation of the Washington Consumer

---

[1] Bluhm later refers to this agreement as "the purported 'Confidential Agreement and Release' dated August 17, 2017." Dkt. 31, ¶ 61.

Protection Act, RCW Chapter 19.86, violation of Florida's Deceptive and Unfair Trade Practices Act, negligence, gross negligence, tortious interference with business expectancy, and unjust enrichment. Against WVR and WVO, Bluhm also alleges fraud and fraud in the inducement. Bluhm seeks injunctive relief and other relief including damages and rescission or reformation of contracts.

## III.  DISCUSSION

Defendants' motion asks the Court to dismiss Bluhm's claims for lack of personal jurisdiction or for failure to state a claim, or in the alternative, transfer the action to the Middle District of Florida. Dkt. 37 at 2. Defendants' reply argues that Bluhm failed to respond to the motion to transfer venue, so the Court should grant it. Dkt. 43 at 2. As before, the Court finds it prudent to assess jurisdiction over the parties before considering a motion to dismiss or to transfer venue.

**A.  Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2)**

To determine whether it has jurisdiction over a defendant, a federal court applies the law of the state in which it sits, as long as that law is consistent with federal due process. *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). Washington grants courts the maximum jurisdictional reach permitted by due process. *Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004). Due process is satisfied when subjecting the entity to the court's power does not "offend 'traditional notions of fair play and substantial justice.'" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[T]raditional notions of fair play and substantial justice" require that a defendant have minimum contacts with the

forum state before it may be haled into a court in that forum. *Int'l Shoe*, 326 U.S. at 316 (1945). The extent of those contacts can result in either general or specific personal jurisdiction over the defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

"Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks and citations omitted). "Additionally, any evidentiary materials submitted on the motion are construed in the light most favorable to the plaintiffs and all doubts are resolved in their favor." *See Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002).

## 1. General Jurisdiction

General jurisdiction permits a court to consider claims against a person or corporation for any conduct, even that which occurred outside the forum state. *Goodyear*, 564 U.S. at 924; *Daimler*, 571 U.S. at 126–27. A court may assert general jurisdiction over a foreign corporation when the corporation's affiliations with the state "are so 'continuous and systematic' as to render them essentially at home in the forum State." *BNSF RR. Co. v. Tyrrell*, 137 S.Ct. 1549, 1559 (2017) (quoting *Daimler*, 571 U.S. at 127). Generally, a corporation is considered at home where it is incorporated or where it has its principal place of business; in exceptional cases, such as when a corporation has relocated the center of its enterprises due to war, a corporation may be considered at

home in another location. *Id.* (discussing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)).

Each named defendant is a Delaware corporation with a principal place of business in Florida. Dkt. 31, ¶¶ 2–4. While Bluhm argues that "Defendants have a significant presence in Washington State, including a large corporate office in Redmond, Washington, 102 hotels and resorts state-wide, and registration of their various affiliated entities with the Washington Secretary of State to do business in the state," Dkt. 40 at 6 (citing Dkt. 31, ¶¶ 8–23), these facts do not suggest Defendants have relocated the center of their operations to Washington. Therefore, general jurisdiction is lacking.

## 2.      Specific Jurisdiction

Specific jurisdiction permits a district court to exercise jurisdiction over a nonresident defendant for conduct that "create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). A defendant creates a substantial connection when it purposefully directs its activities at the forum state, the lawsuit arises out of or relates to the defendant's forum-related activities, and the exercise of jurisdiction is reasonable. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). If the plaintiff establishes the first two factors, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' in order to defeat personal jurisdiction." *Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). These considerations include the extent of the defendant's purposeful interjection into the forum, the burden on the defendant, conflict of

sovereignty with the defendant's state, the forum state's interest, judicial efficiency, the importance of the forum to the plaintiff's interest in convenient and effective relief, and the alternate forums. *Picot*, 780 F.3d at 1211 (citing *Core-Vent v. Novel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993)).

"When a plaintiff relies on specific jurisdiction, he must establish that jurisdiction is proper for 'each claim asserted against a defendant.'" *Id*. at 1211 (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)). "If personal jurisdiction exists over one claim, but not others, the district court may exercise pendant personal jurisdiction over any remaining claims that arise out of the same 'common nucleus of operative facts' as the claim for which jurisdiction exists." *Id*. (quoting *Action Embroidery*, 368 F.3d at 1181).

For contract claims, courts ask whether a defendant has purposefully availed itself of the privilege of doing business within the forum state. *Id*. (citing *Schwarzenegger*, 374 F.3d at 802). For tort claims, courts ask whether a defendant purposefully directed its actions at the forum state. *Id*. (citing *Schwarzenegger*, 374 F.3d at 802–03). Purposeful direction constitutes (1) an intentional action, (2) expressly aimed at the forum state, which (3) causes harm "the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Core-Vent*, 11 F.3d at 1485–86 (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)).

While Bluhm's claims could be construed as primarily in tort—stemming from intentional misconduct intended to induce him to sell his timeshare holdings—the Court finds it more appropriate to analyze Bluhm's claims under the contract framework

because Bluhm alleges the parties had an established and ongoing commercial relationship and the event precipitating this lawsuit is the alleged breach of Bluhm's rights in that commercial relationship.

While Defendants are generally correct that Bluhm lists various facts regarding their commercial presence in Washington but does not allege that his claims arise out of this presence, Bluhm does allege his claims arise out of the online reservation system. *Picot*, 780 F.3d at 1211. The bulk of the parties' interactions since 2012 occurred in the form of transactions through the online reservation system.

The parties agree that in the context of specific jurisdiction when the contact being evaluated between the defendant and the forum is a website, the Ninth Circuit considers whether a website is passive or interactive (on a sliding scale) to determine its jurisdictional effect. *See Boschetto v. Hansing*, 539 F.3d 1011, 1018 (9th Cir. 2008) (discussing *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir. 1997)). Passive websites simple provide information, while interactive websites allow the exchange of information and facilitate commercial activity. *Cybersell*, 130 F.3d at 419. Purposeful availment requires "'some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Boschetto*. at 1016 (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)). In analyzing the sale of goods between individuals over eBay, the Ninth Circuit stated that regular sales "used as a means for establishing regular business with a remote forum" may help establish personal jurisdiction. *Id*. at 1019. While the mere existence of a contract with a party in the forum state is insufficient for jurisdiction, *Burger King*, 471 U.S. at 478, courts consider

negotiations and expected future consequences, the terms of the contract, "and the parties' actual course of dealing to determine if the defendant's contacts are substantial and not merely random, fortuitous, or attenuated," *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). "Where a defendant directly controls whether consumers in the forum can complete purchases from their website or app, they cannot later claim to have merely inserted their goods into the stream of commerce." *Wilson v. PTT, LLC*, 351 F. Supp. 3d 1325, 1335 (W.D. Wash. Dec. 14, 2018) (collecting cases for the proposition that a defendant's choice to make a commercial website or app available nationally constitutes purposeful availment).

Bluhm's Second Amended Complaint alleges that the online reservation system was managed by WVR "and possibly" WVO and WDI. Dkt. 31, ⁋ 12. The online reservation system is made available to the general public, which includes Washington residents "both as timeshare owners using the system to rent their Wyndham timeshare properties and to the general public seeking Wyndham timeshare rentals." Dkt. 40 at 8 (citing Dkt. 31, ⁋ 11). Bluhm alleges that when he sold a booking through the system, he received sixty percent of the revenue from the sale, Defendants would retain the remainder in commission, and that his share was paid by WVO's Extra Holidays department, Dkt. 31, ⁋ 31, and alleges that he used the reservation system extensively between 2013 and 2017, *id*. ⁋⁋ 31–35. As noted, Bluhm alleged that in 2016, he earned $262,000 in gross income through these bookings. *Id.* ⁋ 37. Bluhm alleges, albeit vaguely, that part of the performance of his contractual relationship with Defendants rested on access to the online reservation system. *See* Dkt. 31, ⁋ 45 ("Despite the fact that

[Defendants were] legally and contractually obligated to use his properties as intended, [Defendants] refused to help . . . .").[2] Bluhm's problems arose when each defendant "may have intentionally designed the new reservation systems in a way to make it unusable for high-volume users like Plaintiff," were aware "that high volume users generally, and Plaintiff specifically, derived business income from renting their timeshare properties" and sought to constrain his business through the website redesign. *Id.*, ⁋⁋ 65, 97–98.

Defendants are correct that in the Ninth Circuit, "[i]t is well established that, as a general rule, where a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." Dkt. 43 at 4 (citing *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007)). Therefore, the Court will review Bluhm's allegations as they relate to each defendant.

Regarding WDI, Bluhm alleges that it possibly managed the online reservation system, may have intentionally redesigned the system to constrain its functionality for his business, and retained part of the sale price when he sold bookings. Dkt. 31, ⁋ 12, 31, 65, 97–98. Bluhm also specifically alleges that WDI is "the successor to the entity which

---

[2] Bluhm's breach of contract claim reads in part as follows: "[Bluhm] entered into various contracts and agreements to which Defendants were either a party/parties or were intended beneficiaries. These contracts and agreements were in both oral and written form and include, without limitation, the [August 17, 2017 Agreement]; maintenance/service agreements; agreements related to the Wyndham reservation system; various purchase and sale agreements for timeshare properties; and the other contracts and agreements alleged through Plaintiff's complaint. Defendants have breached the terms of these agreements. The actions and representations made by Defendants also represented a breach of the oral and written agreements and understandings Plaintiff had developed with Wyndham companies over the course of many years." Dkt. 31, ⁋ 61.

developed, marketed, and transacted the timeshares purchased and sold by the Plaintiff and provided property management services, including the online reservation system that is central to this litigation," either directly or through oversight and management of WVR and WVO. *Id.* ¶ 2. Therefore, Bluhm alleges WDI purposefully availed itself of the Washington market by managing an online reservation system where Washington timeshare owners could essentially resell their timeshare assets for mutual commercial benefit.

Regarding WVR, Bluhm alleges WVR developed, marketed, and sold timeshare properties, provided the online reservation system, is listed as the seller "under the purchase and sale contracts that [Bluhm] entered into as the [b]uyer . . . ." and retained part of the sale price when he sold bookings. *Id.* ¶ 5, 31.[3] Bluhm purchased at least some of his 68 total contracts representing timeshare interests directly from WVR. *Compare id.* ¶ 5 ("[WVR] is the entity that sold the ownership/timeshare interests to Plaintiff.") *with id.* ¶ 32 ("Plaintiff began to buy up all the points and deeds that he could, including from disgruntled timeshare owners who were selling their contracts on places like E-bay."). Bluhm alleges that WVR made specific misrepresentations about "the true purpose for shutting Plaintiff out of its online reservation system and the potential restoration of his access. *See, e.g., id.* ¶¶ 113–24. Therefore, Bluhm alleges WVR purposefully availed itself of the Washington market by selling him timeshare properties and managing an

---

[3] The Court notes that the two representative contracts provided were executed in late July 2017, the time period in which Bluhm otherwise alleges he was selling his timeshare interests back to Defendants. *See* Dkt. 31–16.

online reservation system where he and other Washington timeshare owners could resell their timeshare assets for mutual commercial benefit, as well as engaging in specific negotiations with him while he was in Washington.

Regarding WVO, Bluhm alleges that it possibly managed the online reservation system, may have intentionally redesigned the system to constrain its functionality for his business, and retained part of the sale price when he sold bookings. *Id.* ⁋ 12, 31, 65, 97–98. As noted, Bluhm alleges that for each reservation sold, he would receive payment from WVO's Extra Holidays department. *Id.* ⁋ 31, Bluhm alleges that WVO knew about, participated in, and concealed the misrepresentations WVR made to him in order to convince Bluhm to sell his interests. *See, e.g.*, *id.* ⁋⁋ 113–24. Bluhm alleges that when he sold back the sixty-four contracts, he signed an overarching agreement with WVO—the August 2017 Agreement. *Id.* ⁋ 49. Therefore, Bluhm alleges WVO purposefully availed itself of the Washington market by managing an online reservation system where he and other Washington timeshare owners could resell their timeshare assets for mutual commercial benefit, directing a substantial amount of money to him through that mutually beneficial commercial relationship, and engaging in specific commercial negotiations with him while he was in Washington.

While Defendants ask the Court to follow *Bell v. Imperial Palace Hotel/Casino, Inc.*, 200 F. Supp. 2d 1082, 1085 (E.D. Mo. 2011) ("*Bell*") to find specific jurisdiction lacking, the Court finds the interactivity in the case at bar goes a step beyond *Bell*. Dkt. 43 at 10–11. In *Bell*, the district court reasoned that when buying hotel reservations as opposed to goods "[n]either party anticipates that goods, services or information of

intrinsic value will be transmitted or provided in the forum state as a result of the internet exchange of information." 200 F.2d at 1085. Here, when timeshare owners sold their timeshare assets through Defendants' website, the timeshare owners expected sixty percent of the sale price would be returned to them. Moreover, the contractual nature of the timeshare ownership particularly, in the context of resale through the reservation system, means that Defendants "contemplate future consequences" when selling timeshare contracts and making the online reservation system available for the commercial use of timeshare owners, supporting specific jurisdiction. *Wilson*, 351 F. Supp. 3d at 1335 (quoting *Burger King*, 471 U.S. at 479).

Relevant to a tort theory, Defendants argue that the reservation system upgrade did not have any connection to the forum state. Dkt. 37 at 10 (citing *Bristol-Myers Squibb Co. v. Superior Court of Ca., San Francisco Cty.*, 137 S.Ct. 1773, 1781 (2017) ("*Bristol-Myers*"). In *Bristol-Myers*, the Supreme Court emphasized that in assessing the burden on the defendant, courts must consider "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." 137 S.Ct. at 1780. An activity or occurrence that takes place in the forum state is required. *Id*. at 1781 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Regularly occurring sales of a product are insufficient for "a claim unrelated to those sales." *Id*. (quoting *Goodyear*, 564 U.S. at 931). The Court finds *Bristol-Myers* is distinguishable. While Bluhm may not have purchased his timeshare contracts from Defendants in Washington and Defendants may not have performed the reservation upgrade in Washington, unlike the *Bristol-Myers* plaintiffs who did not have

any interaction with the defendant's products in the forum, Bluhm's primary interaction with Defendants' products for the purposes of this lawsuit constitute placing reservations, posting these reservations for purchase, and receiving payment, which all occurred in Washington.

Turning to the remainder of the analysis, Bluhm's claims arise out of the functionality of the website Defendants made available to facilitate ongoing commercial relationships with timeshare owners including those in Washington. Thus, Bluhm's suit arises out or relates to Defendants' contacts with the forum. *Picot*, 780 F.3d at 1211.

Finally, jurisdiction is reasonable. Considering the factors, both Florida and Washington's consumer protection laws are implicated, though it appears that Florida contract law may be implicated as well. Washington has an interest in protecting its consumers. While there will be a burden on Defendants to litigate in a foreign forum and Florida is an alternate forum, Bluhm could be deprived of convenient relief if forced to litigate in Florida, and Defendants' business presence in Washington suggests their burden may be less. The Court finds that on balance, Defendants have not met their burden to show the exercise of jurisdiction would not comport with fair play and substantial justice. *Harris Rutsky*, 328 F.3d at 1134 (finding defendant did not meet its burden when the factors weighed in both directions).

The Court finds that to the extent certain causes of action could be said to be based in specific interactions such as Bluhm's conversations with Mosquera and the sale of Bluhm's sixty-four contracts, they arise from the same overall nucleus of operative

facts—the commercial relationship centered in online reservation system—such that pendant jurisdiction is appropriate. *Picot*, 780 F.3d at 1211.

**B.      Motion to Transfer Venue**

In their motion, Defendants ask the Court to dismiss Bluhm's claims because they are barred by the parties' settlement agreement. Dkt. 27 at 12-14. Defendants also ask the Court to dismiss Bluhm's breach of contract claim, his Washington Timeshare Act claim, and his Consumer Protection Act claim for failure to state a claim. *Id*. at 14–17. Finally, Defendants make a detailed case for why the Court should transfer venue to the Middle District of Florida under 28 U.S.C. § 1404(a). *Id*. at 17–22. In reply, Defendants argue that Bluhm's response failed to address their motion to transfer venue and argue that the Court should construe the failure to respond as an admission that the motion has merit under Local Rule 7(b)(2). Dkt. 43 at 2 (citing Local Rules W.D. Wash. LCR 7(b)(2)). While the Court does not construe Bluhm's brief argument on this point as a failure to respond, Bluhm's minimal response does not successfully counter Defendants' case for transfer of venue.

**1.      Standard**

"In a typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). Section 1404(a) permits cases to be transferred to any other district where the case may have been brought. 28 U.S.C. § 1404(a). Factors related to the convenience of the parties

1   include "'relative ease of access to sources of proof; availability of compulsory process

2   for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . .

3   . and all other practical problems that make trial of a case easy, expeditious, and

4   inexpensive.'" *Atlantic Marine*, 571 U.S. at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*,

5   454 U.S. 235, 241 n.6 (1981) (internal quotation marks omitted)). "Public-interest factors

6   may include 'the administrative difficulties flowing from court congestion; the local

7   interest in having localized controversies decided at home; [and] the interest in having the

8   trial of a diversity case in a forum that is at home with the law." *Id.* (quoting *Piper*

9   *Aircraft*, 454 U.S. at 241 n.6). The Court should also consider the plaintiff's choice of

10  forum. *Id.* (citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)). After weighing the

11  factors, the district court should "decide whether, on balance, a transfer would serve 'the

12  convenience of parties and witnesses' and otherwise promote 'the interests of justice.'"

13  *Id.* (quoting § 1404(a)).

14       "[W]hen the parties' contract contains a valid forum-selection clause, which

15  'represents the parties' agreement as to the most proper forum,'" enforcing the forum

16  selection clause protects the parties' legitimate expectations and should control in all but

17  the most exceptional cases. *Id.* at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S.

18  22, 31 (1988)). A valid forum-selection clause negates the weight given to the plaintiff's

19  choice of forum, compels a finding that the private-interest factors weigh in favor of the

20  parties' agreed-upon forum and requires a court to consider that "when a party bound by

21  a forum-selection clause flouts its contractual obligation and files suit in a different

22  forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-

law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* at 63–65 (citing *Piper Aircraft*, 454 U.S. at 241 n.6).

### 2. Analysis

Venue is proper in the Middle District of Florida. Civil suits may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Defendants concede they are each subject to general jurisdiction in the Middle District of Florida. Dkt. 37 at 18 (citing *Daimler*, 571 U.S. at 140).

While Defendants do not discuss *Atlantic Marine*, they argue that a valid forum-selection clause applies to Bluhm's claims and should be given significant weight. Dkt. 37 at 21. Bluhm does not respond to this contention. Bluhm argues only that a transfer for convenience to the Middle District of Florida is unwarranted because Defendants constitute "an enormous corporation with a substantial presence in Washington" which "plainly has the resources to defend itself in Washington whereas bringing suit in Florida would create an undue burden on [Bluhm], an individual." Dkt. 40 at 3.

Regarding a forum-selection clause, Defendants cite an exhibit attached to Bluhm's first complaint which appears to list many of Bluhm's timeshare assets and identifies him as a Platinum Owner in Club Wynhdam. Dkt. 37 at 21 (citing Dkt. 1-10). Defendants refer to Club Wyndham as "the Program" and argue that as a member of the Program, Bluhm "voluntarily agreed to be bound to the Club Wyndham Plus Trust Agreement [("the Trust Agreement")], which contains an unambiguous forum selection clause necessitating that any lawsuits brought related to the Trust are to be brought in

Florida." *Id*. (citing Dkt. 37-1, § 14.01). While Bluhm's exhibit is not attached to the

operative Second Amended Complaint, it appears consistent with the allegations therein.

Further, while WVR appears to be the only defendant entity explicitly named in the Trust

Agreement, *see, e.g.*, Dkt. 38-1 at 42, that fact is consistent with Bluhm's allegation that

he purchased his timeshare contracts from WVR, Dkt. 31, ¶ 5. Defendants are correct that

the most recent version of the Trust Agreement as submitted contains § 14.01, governing

construction of the Trust Agreement and containing a forum-selection clause. That

section provides:

> Nothing contained herein shall preclude the Trustee or any Beneficiary
> from the right to judicial construction of any of the terms to this Trust
> Agreement. This Trust Agreement shall be construed in accordance with
> the laws of the state of Arkansas. This Trust Agreement shall be interpreted
> liberally in favor of an interpretation which will give this Trust Agreement
> full force and effect. Any action brought to enforce the terms or interpret
> any provision of this Trust Agreement **or any other action in any matter
> relating to the Trust, the Trustee, the Trust Properties or the Plan shall
> be brought in the State Courts in Orange County, Florida or the
> Federal District Courts for the Middle District of Florida**.

Dkt. 38-1 at 56–57 (emphasis added). While there may be bases to dispute the application

of this forum-selection clause to Bluhm's claims, Bluhm did not provide them. The broad

language of the clause, "any matter relating to . . . the Trust Properties" appears to cover

disputes related to Bluhm's timeshare assets. The Court concludes that the forum-

selection clause likely controls, at least as to WVR. Moreover, though the Ninth Circuit

has recognized three exceptions to the default rule that a forum-selection clause controls

in venue, Bluhm has not met his burden to show this case falls into any of the exceptions.

*Yei A. v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1089 (9th Cir. 2018) (quoting

*M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972) (plaintiff's burden to show (1) a forum-selection clause is invalid due to fraud or overreaching, (2) enforcement of the clause contravenes the strong public policy of the plaintiff's forum, or (3) "trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court.")). Therefore, the Court grants the motion to transfer venue as to WVR.

Defendants do not explain why a forum-selection clause in a contract between Bluhm and WVR controls Bluhm's claims against WDI or WVO. The Court notes that the Ninth Circuit has found in a case involving claims against multiple corporate entities for breach of a contract with one entity that a forum-selection clause can apply beyond contract signatories when "the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants." *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988). While in *Manetti-Farrow* the conclusion was likely bolstered by the fact that at least one of the non-signatories had entered a separate agreement consenting to the terms of the contract at issue, *id.* at 511, Defendants' alleged conduct in the case at bar appears similarly coordinated and overlapping. Moreover, the convenience factors as presented weigh in favor of transfer as to WDI and WVO. Defendants point out that Mosquera and other employees of Defendants who may have made relevant decisions are employed in Florida, the reservation systems and sites are maintained in Florida, and the Extra Holidays leadership and personnel are located in Florida, making access to witnesses and sources of proof easier and less costly in Florida and the availability of compulsory

process for unwilling witnesses more certain. Dkt. 37 at 19–21. Additionally, the August 17, 2017 Agreement between WVO and Bluhm, which Defendants argue entirely bars Bluhm's claims, is governed by Florida law with which the Florida court is more familiar. *Id*. at 19. While Bluhm's choice of forum and the parties' contacts with the forum may weigh against transfer, the Court concludes that particularly with the possible application of the forum-selection clause to WDI and WVO in conjunction with the other factors and to avoid duplicative litigation, the motion should be granted as to all parties. Thus, the Court grants Defendants' motion to transfer venue as to WDI and WVO as well.

Finally, the Court finds that to promote judicial efficiency and consistency, the substantive questions raised in Defendants' motion to dismiss pertaining to the August 17, 2017 Agreement, the breach of contract claim, and the Washington Timeshare Act and Consumer Protection Act claim should be denied as moot in order to preserve the substantive issues in this case for the transferee court.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion to transfer venue, Dkt. 37, is **GRANTED**. Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED**, and Defendants' motion to dismiss for failure to state a claim is **DENIED as moot**. Dkt. 37.

The Clerk shall transfer the case to the U.S. District Court for the Middle District of Florida.

Dated this 21st day of November, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge